## CHILTON v. CARPENTER.

No. 9722—Opinion Filed March 23, 1920.

Rehearing Denied May 11, 1920.

(Syllabus by the Court.)

1. **Replevin—Elements of Damage—Usable Value.**

Where personal property has a distinct usable value, the same may be recovered as damages for its detention; and a general allegation of damages in the petition in replevin is sufficient to authorize a recovery of property while wrongfully detained by defendant, from the date of the demand for the return of the property to the date of trial.

2. **Limitation of Actions—Action to Recover Stolen Property.**

The statute of limitations as to personal property in the hands of a thief, who has removed it from the vicinity of the owner, or secreted it from him, does not begin to run until he returns the property to the vicinity, and openly and notoriously holds it, so that the owner may have a reasonable opportunity of knowing its whereabouts and of asserting his title. If the statute had not begun to run while the property was in the possession of the thief, his grantee can claim nothing by his possession. If the thief has done nothing to start the statute in his favor, his vendee cannot tack the thief's possession, or any part of it, to fill out the unexpired time.

Error from the District Court, Oklahoma County; Geo. W. Clark, Judge.

Action by P. E. Carpenter against Blake Chilton. Judgment for plaintiff, and defendant brings error. Affirmed.

Jno. H. Wright and Clarence J. Blinn, for plaintiff in error.

Morgan & Deupree, for defendant in error.

PITCHFORD, J. On February 17, 1917, defendant in error, plaintiff below, filed replevin action in the justice court against plaintiff in error, defendant below, alleging that he was the owner of the horse in controversy and praying for the recovery of the horse and damages. From the judgment in the justice court an appeal was taken to the district court. The parties will be designated as they appeared in the trial court. From the judgment rendered in the district court in favor of the plaintiff, the defendant appeals.

The only assignments of error which, in our judgment, are necessary to consider are the fifth and sixth, wherein error is assigned as to the amount of the judgment rendered for damages; and error of the court in not holding that the statute of limitations had run.

We will first consider whether or not the damages awarded are excessive. This was purely a question for the jury, and the verdict should not be disturbed if there was sufficient evidence upon which to base the finding of the jury. Plaintiff demanded $75 damages for the detention of the horse at the time the action was filed. The demand appears to have been made upon the defendant about the first day of February, 1917. It is conceded that the horse died on the 11th day of June, 1917. Suffice it to say we have examined the evidence and find that the same was sufficient to sustain the verdict of the jury. Section 4807, Rev. Laws 1910, provides that in an action to recover the possession of personal property, judgment for the plaintiff may be for the possession, or for the recovery of possession, or the value thereof in case delivery cannot be had, and of damages for the detention. In our judgment, this would entitle the plaintiff to his damages from the date of the demand for the property detained up to the day of the trial. To the same effect, see Brook v. Bayless et al., 6 Okla. 568; Hunt v. Cohen, 74 Oklahoma, 179 Pac. 1.

It appears from the evidence that the plaintiff lived near Harrah, in Lincoln county, about 25 miles from Oklahoma City. On the 12th or 14th day of September, 1914, plaintiff's horse was stolen. While a diligent search was made to apprehend the thief and recover the horse, the plaintiff never saw the horse again until some time in February, 1917, at which time it was found in the possession of the defendant in Oklahoma City. When demand was made for the horse, the defendant stated that he had received it from Curley Shawn; that Shawn had bought it from Applegate; and that Applegate had bought it from Atwood. The plaintiff was at the time told by the defendant that if the plaintiff would have Atwood and Petty examine the horse, and after examination, they said it was not the Atwood horse sold to Applegate, he (the defendant) would surrender the same to the plaintiff. Thereafter, the plaintiff had Mr. Atwood and Mr. Petty examine the horse, and they each stated that the horse then in the possession of the defendant was not the horse that had been sold by Atwood to Applegate. On the other hand, Applegate, in behalf of the defendant, testified that the horse then held by the defendant was the identical horse that he had sold to Shawn; however Applegate does not give the name of the person from whom he bought it. Shawn testified that it was the same horse he bought from Applegate and had traded to the defendant. There was a remarkable similarity between the Atwood horse and the horse stolen from plaintiff. They were of the same color and the same size; there being a slight difference as to weight. The horse stolen from plaintiff was blind in his left eye, and some of the witnesses testified it looked like the eye had been gouged out. While some witnesses testified that the Atwood horse was also blind in the left eye, none of them testified that there was any peculiarity regarding the eye further than he was simply blind in that eye. Defendant stated that he bought the horse in controversy from Shawn in the month of April, 1915. Applegate, however, testified that he sold the horse to Shawn in July, 1915. Shawn testified that he only kept the horse two weeks and sold or traded him to the defendant the latter part of July, 1915. Shawn further testified that he was not discharged from the penitentiary until the 2nd day of May, 1915. It seems that he had been convicted of the larceny of domestic animals and had been sentenced to a term in the penitentiary. It further appears that the horse owned by Atwood and sold to Applegate was named "Old Bob", and defendant called the horse in controversy "Bob". The defendant failed to testify at the trial.

The query naturally arises, Did the defendant, during this time, own two horses that were as near alike as the two testified about by the witnesses? If so, what had he

done with the other horse? The defendant had more information upon this subject than any other person could have had and was probably the only man who could explain. While it is true his witnesses swore positively that the horse in controversy was the one bought from some one in Oklahoma City by Applegate, and sold by Applegate to Shawn, and by Shawn to defendant, the witnesses on the part of the plaintiff swore with equal positiveness that the horse in controversy was the plaintiff's horse. The question then became one purely for the jury. Under the evidence in the case, whichever way the jury decided would have been binding. The evidence was conflicting, and the jury would have had evidence to sustain their verdict either way they had decided. The seventh instruction given by the court presents the law in the case fairly to both plaintiff and defendant, and, in our judgment, fully meets every requirement under the evidence in the case. The instruction is as follows:

"So when you simmer this down, there is really but one question in the case to be determined; that is, is this the horse, the one that is sued for here, the one that Mr. Applegate purchased in good faith in September, 1914, and a few months thereafter sold to Shawn, who thereafter, within a short time, sold to Mr. Chilton? If that should be true, then the statute of limitations would have to run against it, and your verdict should be in favor of the defendant, but if it is not that horse, as Mr. Chilton had not had possession of it for two years, if the evidence should show and you believe from the evidence that his grantors had not had it so as to make up the full term of two years ownership by two or three of them prior to the 17th day of February, 1917, then your verdict should be in favor of the plaintiff."

In Shelby v. Shaun, 28 Okla. 605, 115 Pac. 785, Mr. Justice Williams, in delivering the opinion of the court, said:

"The statute of limitations as to personal property, though stolen, when held in good faith for value, openly and notoriously, runs in favor of such adverse possession so as to bar recovery by the true owner after the expiration of two years. After the statute of limitation begins to run, such subsequent purchaser may tack on such prior adverse holding in order to complete the bar."

In McGehee v. Alexander, 33 Okla. 699, 127 Pac. 480, it is said:

"The statute of limitations as to personal property stolen begins to run in favor of an innocent purchaser for value and against the true owner from the time the property is bought and taken possession of by the purchaser, and the bar falls when the same is by him held openly and notoriously for three years."

This last decision was under Mansfield's Digest, section 4478. The only difference between our statute and that found in Mansfield's Digest is that our statute is two years and the Arkansas statute is three years. It will be noted from the two cases from which we have quoted that there was no question as to the identity of the horse sought to be recovered, but in the instant case, evidently there were two horses, the one bought in April, 1915, and the other, the last of July, 1915. Where was the horse in controversy all this time? If this information was in the possession of the defendant, it certainly was his duty to explain. In the case of Shelby v. Shaun, supra, this court, in approving the Indian Territory case of Gatlin v. Vaught, 6 Ind. Ter. 254, 91 S. W. 38, quotes as follows:

"'We therefore hold that the statute of limitations as to personal property in the hands of a thief who has removed it from the vicinity of the owner or secreted it from him does not begin to run until he returns the property to the vicinity, or openly and notoriously holds it, so that the owner may have a reasonable opportunity of knowing its whereabouts and of asserting his title. * * * A grantor can convey no better title than he has himself. If the statute has not begun to run, his grantee can claim nothing by virtue of his possession. If the thief, after having concealed the property, has done nothing in relation to it to start the statute in his favor, his grantee cannot tack the thief's possession, or any part of it, to fill out his unexpired time. It is otherwise if the statute began to run while the property was in the hands of the thief. Then the purchaser may tack to his unexpired time the time the property was in the thief's possession after the statute began to run. If the statute did not begin to run while the property was in the possession of the thief, and if it were bought by an innocent purchaser, it commenced at the time the purchaser took possession by virtue of the sale. And if the buyer be not an innocent purchaser, if he knew it to be stolen property, he was but the receiver of stolen property, and the statute would not begin to run as to him until he should have done with it what a thief is required to do in order to bring it within the operation of the statute.'"

To the same effect see the case of Vaut v. Gatlin, 31 Okla. 394, 120 Pac. 273, where the court says.

"We are therefore of the opinion that, as pending the time the mules were out of this jurisdiction, the statute was suspended, and as the time since their return was too short to complete the bar, no matter how peaceable,

open, and notorious might have been the possession of the defendant, the court did not err in refusing to submit the issue of the running of the statute to the jury as requested, and, finding no error in the record, the judgment of the trial court is affirmed."

See also Torrey v. Campbell, 73 Oklahoma, 175 Pac. 524; 34 Cyc. 1423.

We therefore conclude that the judgment of the trial court should be affirmed, and it is so ordered.

All the Justices concur.